UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VHS UNIVERSITY LABORATORIES, INC.,
d/b/a DMC UNIVERSITY LABORATORIES,

                          Plaintiff,                          No. 13-cv-13780

vs.                                               Hon. Gerald E. Rosen

LOCAL 283 OF THE INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN, AND
HELPERS OF AMERICA,

                          Defendant.

_____/

OPINION AND ORDER REGARDING CROSS-MOTIONS
TO VACATE AND TO ENFORCE ARBITRATION AWARDS

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on October 24, 2014

PRESENT:Honorable Gerald E. Rosen
United States District Chief Judge

I. INTRODUCTION

     This matter arises out of a dispute over the payment of fees for the arbitration of 24

grievances concerning holiday pay submitted by Teamsters Local 283 ("the Union") on

behalf of laboratory technicians at the Detroit Medical Center (the "DMC") pursuant to

the DMC-Local 283 collective bargaining agreement.  DMC University Laboratories, a

1

wholly-owned subsidiary of the DMC,[1] filed this action seeking an order vacating the arbitration awards in which the DMC was defaulted and the holiday pay grievances upheld based upon the DMC's non-payment of required grievance arbitration fees.  The Union cross-moved for a summary judgment ruling enforcing the arbitration awards. Responses and reply briefs have been filed.

Having reviewed and considered the parties' briefs and supporting evidence, the Court has determined that the relevant allegations, facts and legal arguments are adequately presented in these submissions, and that oral argument would not substantially aid the decisional process.  Therefore, the Court will decide this matter "on the briefs." *See* Eastern District of Michigan Local Rule 7.1(f)(2).  This Opinion and Order sets forth the Court's ruling.

## II.  FACTUAL BACKGROUND

Teamsters Local 283 represents laboratory technicians and senior technicians employed at the Detroit Medical Center and other DMC facilities pursuant to a collective bargaining agreement ("CBA") entered into by Local 283 and the DMC on January 1,

---

[1]  Though the preamble to the contract refers to "DMC University Laboratories" as the "employer" [*see* Complaint, Ex. 1, p. 1], the signatories of the collective bargaining agreement actually were "The Detroit Medical Center Corporation" and "Teamsters Local 283" [*see* Complaint, Ex. 1, p. 37]. In their briefs, both parties here also refer to the DMC as the employer-in-interest.  Therefore, the Court will refer to the DMC as the employer throughout this Opinion.

2012.[2]

The dispute that eventually led to this action arose shortly after Memorial Day 2013 when 24 DMC lab technicians filed grievances under the CBA on issues related to the Memorial Day holiday.  Some senior DMC lab technicians asserted that the DMC had breached the contract by denying them the right to bid on a schedule that would allow them to work the holiday thereby denying them the ability to earn holiday overtime pay. [*See* Declaration of Local 283 President Steve Hicks, Defendant's Ex. 5, ¶ 7]. Of those lab employees who actually worked the holiday, some asserted that the DMC had breached the contract by forcing them to take another day off later in the bi-weekly pay period, which had the effect of giving them only 72 hours worked and 76 hours of pay (instead of pay for a full 80 hours of work plus overtime pay).  *Id.* ¶ 8.  Some employees also asserted that the DMC breached the contract by failing to post the holiday work schedules seven or more days in advance as called for under the CBA. *Id.* ¶ 9.

The DMC claimed that the grievances should have been filed as a "group grievance," and denied all 24 grievances on one "Grievance Response Form."  [*See* Defendant's Ex. 6.][3]  After receiving the DMC's response, Local 283's President Steve

_____

[2]  As originally drafted, the CBA covered a two-year period ending December 31, 2014.  However, the period was subsequently extended for two additional years.

[3]  Although the DMC responded on one form, it gave three separate responses (in two numbered paragraphs) each of which responded to the various grievance claims:

1[a].  The grievance is untimely.  The CBA provides that "No grievance shall be recognized or processed based on facts or events. . . which occured

3

Hicks proposed to Hakim Berry, the DMC's Director of Labor Relations, that the parties agree to taking four of the grievances to arbitration and that they let those four grievances set the pattern for the other 20. Berry rejected that proposal. Therefore, pursuant to the collectively-bargained grievance procedure, the Union appealed all 24 grievances to the Industrial Board Arbitration Committee (the "Board"). [Hicks Decl., ¶¶ 11-13.]

The CBA's Grievance/Arbitration Provisions

The Grievance and Arbitration procedure applicable to the DMC union employees involved in ths dispute is set forth in Article VI, Section 3 of the DMC-Local 283 Agreement. The first two steps of the four-step procedure (i.e., the submission of the grievance in writing and a timely decision by the supervisor or other DMC management designee) are not at issue here. The issue here concerns the third step of the procedure which is as follows:

---

more than ten (10) calendar days prior to the date of the presentation of the grievance."

1[b]. The Employer has a long established practice that has been accepted by both Parties with respect to the provision of holidays and the right of the Employer to give a substitute day off or special compensation to those employees who work a holiday. The application of this practice by the Employer with respect to holidays has never been challenged until just recently by the Union.

2. No violation of contract. Schedules were posted well in advance of the 7 days required in Article VII.1.a.

[Plaintiff's Ex. 5 (some enumeration added).

4

Step 3.        <u>Industrial Board Arbitration Committee</u>

If the grievance is not satisfactorily resolved in Step 2 above, it may be submitted to the Industrial Board at the request of the Union.  A request to submit the grievance to arbitration must be made, in writing, to the Employer's Director of Labor Relations and/or designee not later than thirty (30) calendar days from the date of the answer in Step 2.  If the union fails to request to advance to the Industrial Board within this time limit, the grievance shall be deemed settled on the basis of the answer in Step 2.

(B)  In the event of a refusal by either party to submit or appear at the Industrial Board hearing, the Industrial Board shall have jurisdiction to proceed ex-parte and make an award.  The decision of the Industrial Board shall be rendered without undue delay.  All settlements made in the grievance procedure, including the decision of the Industrial Board shall be final and binding on all parties (EXCEPT AS OTHERWISE INDICATED IN THIS ARTICLE), including the employees involved for grievances.

(C)  The cost of the Industrial Board to the Employer shall be annual dues in the amount of six hundred ($600.00) dollars.  **The Employer shall also pay in advance at the Secretary's office, the sum of sixty ($60.00) dollars for each grievance placed on the docket of the Board.**  The Employer must send a signed copy of the current Agreement to the Secretary's office.

**(D)  The Industrial Board shall have the sole and exclusive power and jurisdiction to determine whether or not a particular grievance, dispute or complaint is arbitrable to the Board under the terms of the Agreement.**

(E)  With the exception of terminations and, [sic] any award by the Industrial Board against the employer with [a] cost of ten thousand ($10,000) or less shall be final and binding on the parties.

Step 4.        <u>Final Arbitration</u>

**The Employer only may appeal to final and binding arbitration any award of the Industrial Board with a cost**

5

> **to the Employer of over ten thousand ($10,000), decisions involving group grievances/class actions or matters involving termination**.  The request to arbitrate must be made within twelve (12) days of the Industrial Board decision.  In the event [final] arbitration is requested, an arbitrator may be selected from a mutually agreed upon panel of arbitration. . . .

CBA, Art. VI, §§ 3, 4 (emphasis added).

<u>The Industrial Board Arbitration Committee</u>

The Industrial Board Arbitration Committee (the "Industrial Board") referred to in Step 3 of the DMC-Local 283 Grievance Procedure is an arbitration committee composed of representatives of various local unions and employers who sit as a whole and decide grievances that are presented to them that have not been settled at the local level.  [*See* Industrial Board Arbitration Committee Rules of Procedure, Complaint Ex. 3, p. 1.] It is similar to the "joint committees" that exist throughout the trucking and other industries where the employees are represented by the Teamsters.  Approximately 105 to 110 employers with Teamsters locals use the Industrial Board Arbitration Committee as a step in their grievance procedures.  [*See* 11/22/13 Deposition of Barry Solomon, p. 11.]

The full Industrial Board is comprised of eight local union representatives and eight employer representatives, plus the Chairman.  [Industrial Board Rules of Procedure, p. 5.] The Board however may function with as few as one union representative and one employer representative, *id.*, but no union representative may sit and decide his or her Local's case; likewise, no management representative may sit and decide his or her company's case.  *Id.*, p. 2.  In all cases, the Chairman has the right to vote to break a

6

deadlock.  *Id.,* p. 5.

The Industrial Board meets on the third Monday of each month at the Four Points

Sheraton Hotel in Romulus, Michigan.  *Id*., p. 1; Solomon 11/27/13 Dep., p. 156.

Grievances that are received by the Monday preceding the Board's regular monthly

meeting are placed on the docket for hearing that month.  [Industrial Board Rules of

Procedure, Rule 1, Plaintiff's Ex. 3, p. 1]  Each party is entitled to one adjournment as of

right; any adjournment thereafter must be by stipulation of the parties or for good cause

shown.  *Id.*, Rule 3, Ex. 3, p. 2.  For any adjournment, however, the adjourning party must

pay the normal grievance fee [i.e., $60].  *Id.*; Adjournment and Settled Fees Addendum,

Ex. 3, p. 5.[4]

The Industrial Board's Rules of Procedure further provide:

> All annual dues and grievance fees must be paid when billed.  Failure to do
> this will deprive the Board of the ability to hear the case.  Annual dues will
> be billed on the first of January each year; grievance fees will be billed
> along with the Decision. . . .

Industrial Board Rules of Procedure, Rule 10, Complaint Ex. 3, p. 3.

<u>Barry Solomon's Role as the Industrial Board's Secretary</u>

Barry Solomon is the Industrial Board's secretary.  Solomon testified that he has

been the Board's secretary for close to fifty years.  [Solomon 11/22/13 Dep., p. 10.]  He

stated that although he was at one time a voting employee representative on the Industrial

---

[4]  For stipulated adjournments, the liability for the adjournment must also be
stipulated to by the parties.  *Id*., Rule 3, Mutual Adjournment Addendum.

Board Arbitration Committee, *id.,* as the Board's secretary he does not have a vote at arbitration hearings; rather he is responsible for the ministerial duties attendant with the arbitrations. *Id*. at p. 19. He is responsible for preparing the arbitration dockets, the transcription and mailing of the Board's decisions, making room arrangements for the hearings, and arranging for the Committee's lunches. *Id.* Solomon also does all of the billing and collects all of the fees for the arbitrations. *Id.* at p. 20.

The bills Solomon sends to all employers utilizing the Industrial Board arbitration mechanism direct that checks for arbitration fees be made out to "Barry E. Solomon," not to the Industrial Board. *Id.* at p. 21. Solomon testified that this has been the directive given to employers for "maybe fifty years." *Id.* However, Solomon admitted that not all employers comply with that directive; about half of them make out checks to the "Industrial Board Arbitration Committee." *Id*. at p. 22.

Solomon testified that he rents office space in Berkley, Michigan, and it is this space that he uses for Industrial Board work. [Solomon 11/27/13 Dep., p. 103.] However, the Industrial Board is not the only business Solomon runs out of that location; he also runs "Barry Solomon Consultants" from the same office. *Id.* Through this wholly separate consultant business, Solomon represents private companies in contract negotiations and/or non-union issues. *Id.*[5] He also does some entertainment management

---

[5] Solomon is not a practicing attorney. Although he was at one time a member of the State Bar of Michigan, Solomon testified that was disbarred in the mid-1990s, and though at one time he tried to get reinstated to the bar, he ultimately decided he no longer wanted to practice law. Solomon 11/22/13 Dep., p. 8-9.

work through his consulting firm. *Id.*

In terms of the Industrial Board's status as an entity, Solomon stated that the Board is not a corporation or a partnership; rather it is registered as a "d/b/a." *Id.* Solomon testified that he filed a d/b/a -- "Barry E. Solomon doing business as the Industrial Board" -- in Oakland County. [Solomon 11/22/13 Dep., p. 23.][6] He further testified that he deposits all checks paid by employers for arbitrations regardless of how they are addressed into his personal checking account. *Id.* at 23-24, 26. Although Solomon stated that the account is in both his name and the Industrial Committee, only the name "Industrial Committee" is imprinted on the checks. *Id.* at 24.

With respect to his position as the Industrial Board's secretary, Solomon testified that he is without authority to determine when a number of grievances are transmitted to him at one time by the Union whether those grievances should be treated as a "group" grievance; "that's decided by the Board." *Id.*, p. 38. However, he stated "in terms of

---

[6] The Oakland County Clerk's Office online records at www.oakgov.com show that Solomon has actually filed several different d/b/a's. In addition to a number of expired d/b/a registrations for several retail and construction companies, in April 1986, Solomon registered in Oakland County as doing business as the "Industrial Board Arbitration Committee," the "Western Michigan Industrial Board," and the "Mid-Michigan Arbitration Committee." *Id.* He renewed the "Western Michigan Industrial Board" and "Mid-Michigan Arbitration Committee" d/b/a's in 1998, 2004, 2009, and 2014. *Id.* After letting it lapse for five years, Solomon refiled the "Industrial Board Arbitration Committee" name in 2008 and renewed it in 2013. *Id.* Solomon also filed d/b/a's as the "Detroit Arbitration Committee" and the "Industrial Board" in 1989, which he renewed in 2004 and again in 2009. *Id.* All of these industrial board/arbitration committee d/b/a registrations will expire in 2019. *Id.*

billing, billing issues is [sic] quite apart from deciding whether it's a group grievance." *Id.* at 38-39. He further testified that, while in general, in terms of hierarchy, he reports to the Chairman, for billing he really does not report to anyone. *Id.* at p. 40.

The DMC Holiday Grievance Fee Dispute

The 24 DMC holiday grievances at issue in this case were originally placed on the docket for hearing before the Industrial Board at its July 15, 2013 meeting. On July 9, 2013, Hakim Berry, DMC's director of Labor Relations, sent Solomon a letter acknowledging the DMC's receipt of the July 15, 2013 docket of the 24 holiday grievances. [*See* Plaintiff's Ex. 8.] In that letter, Berry also informed Solomon that the DMC considered the holiday grievances to be a "group grievance," that it viewed the filing of individual grievances on the holiday pay issues instead of filing a group grievance as an attempt by the Union "to impede the employer's ability to exercise its rights under [Step 4 of] the grievance procedure,"[7] and that it "was prepared to arbitrate

---

[7] Step 4 of the parties' collectively-bargained grievance procedure, referenced in Berry's July 9, 2013 letter, provides:

> Step 4: <u>Final Arbitration</u>. The Employer only may appeal to final and binding arbitration any award of the Industrial Board with a cost to the Employer of over ten thousand ($10,000), *decisions involving group grievances/class actions,* or matters involving termination.

It is undisputed that none of the individual holiday grievances would result in a cost to DMC over $10,000, and none of them involved termination. Therefore, it was only if the grievances were treated collectively and deemed to be a "group" grievance that the DMC would be entitled to proceed through Step 4 of the grievance procedure to appeal an adverse Step 3 decision by the Industrial Board to final and binding arbitration.

this group grievance issue as a single group grievance on July 15, 2013 for the total fee of sixty dollars." *Id.*; *see also*, Solomon 11/22/13 Dep., p. 47.  Solomon refused the DMC's offer of a single payment of sixty dollars for the 24 grievances.  *Id.*

The following day, July 10, 2013, Berry sent Solomon a written request for an adjournment of all of the grievances scheduled for July 15.  *Id.* at p. 48; *see also* Defendant's Ex. 9.  On July 11, 2013, Solomon faxed Berry a letter in response to his request stating that the requested adjournment would not be allowed because

> [Y]our previous letter to me of July 9th indicated you only intended to pay for one case, and not as billed.  As I told you, this is not your decision and you are therefore in default and have no rights before the Board re: these cases including the right to adjourn.

> If you would like to discuss this, you may reach me at my office.

Plaintiff's Ex. 9; Solomon Dep., p. 49.

According to Solomon, although the Rules provide each party with one adjournment of right, *see* Industrial Board Arbitration Committee Rules of Procedure, Rule 3, Plaintiff's Ex. 3, it was his understanding that to be entitled to exercise that right the party had to be "in good standing," and for DMC to be "in good standing" it would have to pay the amount he billed it.  Solomon Dep., p. 48.  However, Solomon admitted in his deposition that as of the date on which he wrote the letter to Berry he had not yet billed DMC for any of the grievances docketed to be heard at the July 15 arbitration hearing.  *Id.* at 48.

Berry immediately faxed Solomon a letter in response to his letter pointing out that

the DMC had not yet been billed and therefore there was no basis for denying it the right

to exercise its right to an adjournment.  [*See* Plaintiff's Ex. 11.]  He further protested

billing DMC per grievance for the adjournment and informed Solomon that it "w[ould]

pay reasonable and fair adjournment fees as invoiced once the Board has heard the

parties' arguments as to whether these are indeed a group grievance or individual

grievance[s], and exercised its discretion." [*See* Plaintiff's Ex. 12.]

     The Industrial Board convened for its regular monthly meeting on July 15, 2013.

At that meeting, Patricia Leonard, an attorney for the DMC, promised that the DMC

would pay $60 per grievance if the Board adjourned the hearing until August.  [*See*

Declaration of Steve Hicks, Defendant's Ex. 5, ¶ 15; *see also* Plaintiff's Ex. 13.]

The adjournment was ultimately granted and the hearings on the grievances were re-

scheduled and docketed for hearing on August 19, 2013. [*See* Plaintiff's Ex. 14.]

     The following day, July 16th, Solomon sent the DMC a bill for $1,464.00 for fees

assessed for the adjournment of the July hearings on 26 grievances.  [*See* Plaintiff's Ex.

7.] This bill included fees for the adjournment of the July hearings on the 24 holiday

grievances and two unrelated grievances at $60 per grievance, which Solomon discounted

by 10%, plus a past-due amount of $60 for a previous grievance adjournment that had

been requested by the DMC.  *Id.* The bill specified that "the entire balance due must be

received by 8/12/13." *Id.*

     The DMC did not pay this bill by August 12, 2013.  Therefore, on August 14th,

Solomon sent Hakim Berry a letter warning him of the consequences if the bill for the

adjournment fees was not paid before the Industrial Board convened on August 19th.

[*See* Plaintiff's Ex. 16.]  The letter stated:

> Dear Mr. Berry:
>
> Pursuant to the assurances of Detroit Medical Center's representatives at last month's Industrial Board, that we would be paid as billed, and the Board relying upon said representations, [the Board] did allow the Company to adjourn the cases which adjournments had originally been denied per your letter to me re: joint records.  The Board, however, ordered that payment must be made by August 12th (the week before the Board), but I am sorry to say said payment has not been received, and unless this matter is resolved prior to Monday's Board, not only will the Company be in "bad standing," but any discounts (which I did not have to give you) will be abated.
>
> Hopefully this matter will be resolved amicably.
>
> > /s/
> > Barry E. Solomon
> > Secretary, I.B.A.C.

*Id.*

The bill, however, was not paid prior to the August 19, 2013 Board meeting.

The morning of the scheduled Board hearing, Solomon told the members of the Board that if the DMC did not pay for the adjournments as billed before the arbitration hearings commenced that afternoon, he was going to recommend at the hearing that the DMC be found in default, and asked whether any member had any objection to what he proposed to recommend.  [*See* Solomon 11/22/13 Dep, pp. 83-84.]  According to Solomon, none of the Board members had any objections.  *Id*. at 84.

Although DMC representatives appeared for the hearing, they did not make any

payment.  The hearing commenced at approximately 1:45 p.m.  *Id.*  The cases were called by the Sergeant-at-Arms.  *Id.* at p. 81.  Solomon then formally informed the Board of the DMC's failure to pay the fee for adjournment of the hearings on the grievances which had originally been scheduled for July 15th.  *Id.* at 81-82.  He then asked the DMC representatives, "[I]s there any chance we can rectify this?"  *Id.*  There was no response from the DMC.  *Id.*  Therefore, Solomon recommended to the Board that the DMC be defaulted on the grievances and the Board acted on his recommendation.  *Id.* at 82; *see also* Plaintiff's Ex. 17.  After each of the grievances was read into the record, the DMC was found "in default per Rule 10 of the Rules of Procedure."  *Id.*  Because the DMC was found in default due to its non-payment of the grievance adjournment fees, pursuant to Rule 10 of the Industrial Board's Rules of Procedure, the question of whether the holiday grievances should be considered to be a group grievance rather than individual grievances was never heard by the Board.  *See* Solomon 11/22/13 Dep., pp. 85-86.

The transcription of the Board's decision was faxed to the DMC on August 20, 2013.  [*See* Defendant's Ex. 17.]  The next day, August 21, 2013, the DMC was sent a bill for $3,120 which represented $1,560 for the August grievance hearing fees for 26 grievances, among which were the 24 holiday grievances, plus an additional $1,560, representing the now un-discounted past due amount for the July adjournment of these 26 grievances.  [*See* Plaintiff's Ex. 15.]

Several days later, Solomon received a letter from DMC that was dated August 15, 2013 (i.e., prior to the hearing).  In response to questions posed by the DMC in that letter,

14

on August 29, 2013 Solomon provided an explanation of his previous reference to "bad standing" as meaning "in default," and further explained that the DMC had been found in default at the August 19 Board meeting for its non-payment of the grievance hearing adjournment fees. [*See* Plaintiff's Ex. 19.] Solomon further stated that the DMC "will remain in that status until the entire July and August obligation is paid." *Id.*

Because the DMC continued to refuse to pay its July and August 2013 bills, it was also defaulted on subsequent grievances submitted to the Industrial Board. Its tender of single payments of $60 for subsequent individual grievances were rejected as such payments were insufficient to cure the DMC's more than $3,000 on-going default on the July-August 2013 bills. *See e.g.,* Plaintiff's Ex. 21-25.

Being unable to appeal the Industrial Board's decision to Final and Binding Arbitration pursuant to Step 4 of the collectively-bargained grievance procedure, the DMC filed this action seeking an order vacating the adverse arbitration awards. The Union cross-petitioned for an order enforcing the awards.

## III.  DISCUSSION

### A.  APPLICABLE STANDARDS

This case arises under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), as the controversy involves an assertion of rights under an agreement between an employer and a labor organization. Judicial review of a labor-arbitration decision pursuant to such an agreement is extremely limited. *Major League Baseball Players Association v. Garvey*, 532 U.S. 504, 509, 121 S.Ct. 1724, 1728 (2001).

15

In *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364 (1987), the Supreme Court emphasized the "limited role" courts have when the losing party to an arbitration seeks judicial intervention:

> The courts have jurisdiction to enforce collective-bargaining contracts; but . . . [b]ecause the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.

484 U.S. at 37-38,  108 S.Ct. at 370.

The Court explained that it is the arbitrators who are empowered to make factual findings and interpret the contract, without judicial intervention. *Id.* With regard to an arbitrator's interpretation of a collectively-bargained contract, the *Misco* Court directed lower courts not to intervene even if the court finds the arbitrator's interpretation flawed:

> The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.

*Id.*, 484 U.S. at 38, 108 S.Ct. at 370-71 (citing *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362 (1960)).

The only limitation on an arbitrator's interpretation or application of a labor agreement is that it "draw its essence from the contract" and not "simply reflect the arbitrator's own notions of industrial justice." *Id.*, 484 U.S. at 38, 108 S.Ct. at 371.

> [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his

16

decision.

*Id.*, 484 U.S. at 38, 108 S.Ct. at 371.

Thus, the *Misco* Court concluded that, while a federal court retains authority to ensure that, pursuant to the collective bargaining agreement, the issue before the arbitrator was an arbitrable matter and that the arbitral decision was not "procured by the parties through fraud or the arbitrator's dishonesty," *id.*, even if the court finds that the decision of the arbitrator was "improvident [or] even silly," so long as the arbitrator arguably was construing and applying the contract, the decision must stand.  *Id.* at 39, 108 S.Ct. at 371.

*Major League Baseball Players Ass'n v. Garvey*, *supra*, reinforced *Misco*'s view of the federal courts' role in this area.  According to the *Garvey* Court, the federal courts' review of labor-arbitration decisions is not just "limited"; it is "*very* limited," *Id.*, 532 U.S. at 509, 121 S.Ct. at 1728 (emphasis added).  Reaffirming *Misco*, the Court emphasized that "[c]ourts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement." *Id.*  "[I]f the 'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" *Id.* (quoting *Eastern Associated Coal Corp. v. Mine Workers*, 532 U.S. 57, 62, 121 S.Ct. 462 (2000)).  "It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice,' that his decision may be unenforceable." *Id.* at 509, 108 S.Ct. at 1728 (quoting *Enterprise Wheel*, 363 U.S. at 597,

17

80 S.Ct. 1358). But when "an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's 'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award." *Id.* (quoting *Misco*, 484 U.S. at 39, 108 S.Ct. at 371).

In *Michigan Family Resources, Inc. v. Service Employees International Union Local 517M*, 475 F.3d 746 (6th Cir. 2006), the Sixth Circuit synthesized *Misco* and *Garvey* as follows:

> One, [*Misco* and *Garvey*] define the line between a permissible award (that "draws its essence from the contract") and an impermissible award (that "simply reflect[s] the arbitrator's own notion[] of industrial justice") based on whether "the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." Two, *Misco* and *Garvey* show that the Court means what it is saying. In both cases, the Court held that once it was established that the arbitrator was construing or applying the contract (and acting within the scope of his authority), it made no difference whether the arbitrator had committed "serious," "improvident" or even "silly" errors in resolving the merits of the dispute.

*Id.* at 752-53 (citations omitted).

The *Family Resources* court concluded that the Supreme Court's repeated insistence in *Misco* and *Garvey* that federal courts must tolerate "serious" arbitral errors, "suggests that judicial consideration of the merits of a dispute is the rare exception, not the rule." *Id.* at 753. At the same time, the appellate court noted that it could not ignore the specter that

> an arbitration decision could be so "ignor[ant] of the contract's 'plain language,'" as to make implausible any contention that the arbitrator was construing the contract. An interpretation of a contract thus could be "so untethered to" the terms of the agreement. . . that it would cast doubt on

18

whether the arbitrator was indeed engaged in interpretation.

*Id*. (citations omitted).

However, as the court observed, "[s]uch an exception of course is reserved for the rare case.  For in most cases, it will suffice to enforce the award the arbitrator appeared to be engaged in interpretation, and if there is doubt we will presume that the arbitrator was doing just that."  *Id.*

> This view of the 'arguably construing' inquiry no doubt will permit only the most egregious awards to be vacated.  But it is a view that respects the parties' decision to hire their own judge to resolve their disputes. . . and a view whose imperfections can be remedied by selecting better arbitrators.

*Id.* at 753-54.

Accordingly, the *Family Resources* court determined that, with respect to arbitration awards, judicial inquiry may be made only into the "questions of procedural aberration" that *Misco* and *Garvey* identified, to-wit:

> Did the arbitrator act "outside his authority" by resolving a dispute not committed to arbitration?  Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award? And in resolving any legal or factual disputes in the case, was the arbitrator "arguably construing or applying the contract"?

*Id.*

"So long as the arbitrator does not offend any of these requirements, the request for judicial intervention should be resisted even though the arbitrator made 'serious,' 'improvident' or 'silly' errors in resolving the merits of the dispute."  *Id.*

By application of the foregoing standards, the Court concludes that the arbitration

19

award complained of in this case must be enforced.

B.   THE INDUSTRIAL BOARD ARBITRATION COMMITTEE'S DECISION TO HOLD DMC IN DEFAULT DRAWS ITS ESSENCE FROM THE CONTRACT

In moving to vacate the arbitration awards at issue in this case, the DMC argues that (1) the Board Secretary and/or the Industrial Board acted outside their authority by resolving a dispute not committed to arbitration, nor did they arguably construe or apply the contract in deciding the matter; and (2) the arbitration award should be vacated because the Board Secretary has a conflict of interest.

As an initial matter, the Court finds that the DMC's premise that the decisions at issue were made by Barry Solomon, the Secretary to the Arbitration Committee, and not the Arbitration Committee itself, is not factually supported.  To the contrary, the evidence of record establishes that the August-October 2013 default decisions at issue were those of Industrial Board Arbitration Committee.  While Solomon made *recommendations* to the Committee, the Committee made the *decisions*.  *See* Solomon Dep., p. 81.  The decisions were made on the record during regularly convened hearings before the Industrial Board Arbitration Committee.  *Id.* The written decisions themselves were published under the heading "Industrial Board Arbitration Committee: Decisions of Monday, August 19, 2013" [*See* Plaintiff's Ex. 17]; *see also* "Industrial Board Arbitration Committee: Decisions of Monday, September, 2013" Plaintiff's Ex. 22]; "Industrial Board Arbitration Committee: Decisions of Monday, October 21, 2013" [Plaintiff's Ex. 23].  The Court finds the DMC's contention that Solomon made the default decisions

20

particularly disingenuous inasmuch as the DMC's attorneys were present *at the Board hearings* when the decisions were made.  *See* Solomon Dep., pp. 81-83.

There being no factual merit in the DMC's premise that Barry Solomon made the default decisions in question, the Court will proceed to address the DMC's substantive arguments.

1.    <u>The Board Acted Well Within Its Authority</u>

The DMC claims that neither the terms of the CBA nor the Arbitration Committee's Rules of Procedure provide any authority for the Industrial Board Arbitration Committee to have defaulted it for non-payment of grievance and adjournment of hearing fees.  However, as discussed above, pursuant to clear Supreme Court and Sixth Circuit precedent, arbitrators have broad authority to interpret and apply the provisions of collective bargaining agreements, and equally broad authority in formulating remedies for contract violations, and courts are without authority to disturb an arbitrator's judgment.  *See Misco, supra*, 484 U.S. at 38; 108 S.Ct. at 371.

Here, the default decisions the DMC complains of stem from grievances that proceeded through the grievance procedures set forth in the DMC-Local 283 Collective Bargaining Agreement. Specifically, they arise from grievances that had proceeded through Steps 1 and 2 of the grievance procedure set forth in Article VI, § 3 of the CBA, and were presented for hearing before the Industrial Board Arbitration Committee, pursuant to Step 3 of the grievance procedure.

In relevant part, Part (C) of Step 3 provides that the "Employer shall pay in

advance at the Secretary's office, the sum of sixty ($60.00) dollars *for each grievance under this Agreement, which is placed on the docket* of the Board." [*See* CBA, Defendant's Ex. 1, p. 12 (emphasis added).].   Part (D) provides:  "The Industrial Board shall have the sole and exclusive power and jurisdiction to determine whether or not a particular grievance, dispute or complaint is arbitrable to the Board under the terms of this Agreement."  *Id.*

The parties do not dispute that proceedings before the Industrial Board Arbitration Committee are further governed by Rules of Procedure.  *See Misco*, 484 U.S. at 39, 108 S.Ct. at 371 ("The parties bargained for arbitration to settle disputes and were free to set procedural rules for the arbitrator to follow if they so chose." *Id.*)  The Industrial Board Arbitration Committee Rules of Procedure provide, in relevant part:  "*All . . . grievance fees must be paid when billed.  Failure to do this will deprive the Board of the ability to hear the case.*"  [*See* Defendant's Ex. 4, p. 3, Rule 10 (emphasis added).]  The Addendum to the Rules, which became effective June 2002, provides:  "For all cases adjourned after publication [of the docket], the fee to the adjourning party will be in the amount of the grievance per case."  *Id.*, p. 5.

Even a cursory review of these CBA and Rules provisions makes clear that the Arbitration Committee was "arguably construing and applying" the contract in defaulting DMC and concluding that the DMC was precluded from presenting any argument concerning the grievances at a hearing before the Arbitration Committee until its default on the grievance and adjournment fees was cured.  DMC did not pay $60.00 per

22

grievance and did not pay $60.00 per grievance for the adjournment of the hearing on the grievances it had requested. Once the Arbitration Committee found that the DMC had not paid the requisite fees -- which it clearly had not done -- the Committee had the authority to decide that entering a default was the proper remedy for the DMC's breach of its contractual commitment. That the term "default" *per se* does not appear in the CBA or Rules in the context of non-payment of fees is irrelevant. The only relevant question is whether the Arbitration Committee was "arguably construing or applying the contract" when it interpreted the contract in the way that it did; it need only appear that the arbitrator was engaged in interpretation, with all doubts to be resolved in favor of concluding that the arbitrator was doing just that. *Michigan Family Resources*, 475 F.3d at 753. As the Sixth Circuit held in *Totes Isotoner Corp. v. Int'l Chem. Workers Union Council/UFCW Local 664C*, 532 F.3d 405 (6th Cir. 2008), if "it is at all plausible to suppose that the remedy [the arbitrator] devised was . . . implicitly authorized by the agreement," the remedy should be allowed to stand. *Id.* at 422.

Moreover, both the Supreme Court and the Sixth Circuit have made clear that "[W]hen subject matter of dispute is arbitrable, 'procedural' questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator." *Misco*, 484 U.S. at 40, 108 S.Ct. at 372; *United Steelworkers of America v. Saint Gobain Ceramics & Plastics, Inc.*, 505 F.3d 417, 422 (6th Cir. 2007) (holding that, in the absence of contractual language to the contrary, the arbitrator, not the court, should decide whether the party has met the procedural prerequisites for being heard in arbitration). Payment of

23

arbitration fees is one such procedural condition precedent that a court should not review. *Dealer Computer Services v. Old Colony Motors*, 585 F.3d 884, 887 (5th Cir. 2009).

For the foregoing reasons, the Court concludes that the issue of the DMC's non-payment of grievance arbitration fees was a procedural matter properly before the Industrial Arbitration Committee for resolution. The Court further concludes that the Industrial Board Arbitration Committee "arguably construed and applied" the DMC-Local 283 Collective Bargaining Agreement, and its decision to default the DMC on the grievances due to its non-payment of grievance and adjournment of hearing fees, thereby precluding the DMC from presenting any argument before the Arbitration Committee "draws its essence from" that Agreement.

2.    The DMC Has Failed to Show that the Arbitration Committee had a Conflict of Interest that Would Justify Setting Aside the Arbitration Decisions.

The DMC also asserts that because the Industrial Board lets Barry Solomon retain a portion of the grievance fees he collects as payment for his services, Secretary Solomon had a pecuniary interest in collecting the fees and that this alleged interest created an appearance of impropriety that justifies vacating the decisions at issue in this case. In support, the DMC relies upon several New York state court decisions where commercial arbitration awards were set aside on the grounds that the arbitrators had created an "appearance of impropriety" by demanding payment of fees during the course of arbitration. However, none of the New York cases relied upon by the DMC involved an obligation in the contract under which arbitration was held to pay fees in advance of the

24

arbitration hearing.

More importantly, the Sixth Circuit has explicitly rejected the "appearance of impropriety" standard that the DMC propounds in this case.  In *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1314, 1358 (6th Cir. 1989), and *National Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 645 (6th Cir. 2006), the court directly held that the party challenging an arbitration award under the "conflict of interest" exception must provide "proof of actual bias" in order to set aside the award.  "The alleged partiality must be direct, definite, and capable of demonstration," and the party asserting it "must establish specific facts that indicate improper motives on the part of the arbitrator." *National Mut. Ins. Co.*, 429 F.3d at 645.

In this case, the DMC has not even alleged, let alone proven, a violation of these standards.  The Board, not "Secretary Solomon," made the decisions to default the DMC, and the members of the Board, who are entirely unpaid, had no pecuniary interest in the fees that the DMC was required to pay.  Moreover, the insistence on payment of contractually mandated grievance fees does not constitute "specific facts that indicate improper motives on the part of the [Board]." *Id.*  The demand for payment of fees before an argument on a grievance may be heard is no different than requiring the payment of a motion fee before a court will hear a litigant's motion, and no one would suggest that an improper motive of the court could be inferred from requiring such a payment.

While the DMC may not like that Mr. Solomon bills for and collects the fees for arbitrations and that the Industrial Board lets him retain part of the fees he collects as

25

payment for his services, as the Sixth Circuit observed in *Michigan Family Resources*,

any dissatisfaction with this arrangement,"can be remedied by selecting better

arbitrators."  475 F.3d at 754.

CONCLUSION

For all of the foregoing reasons, the Court concludes that there is no basis for

overturning the disputed arbitration decisions.  Accordingly,

IT IS HEREBY ORDERED that Defendant Teamster Local 283's Motion for

Summary Judgment Enforcing the Default Awards **[Dkt. # 19]** is GRANTED.

IT IS FURTHER ORDERED that the Plaintiff's Motion Seeking an Order

Vacating Arbitration Awards and Other Appropriate Relief **[Dkt. # 20]** is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Objection to the Magistrate Judge's

Order denying Plaintiff's motion to amend its Complaint to add Barry Solomon as a

party-defendant is OVERRULED, and the Magistrate Judge's Order of March 31, 2014

**[Dkt. # 27]** is AFFIRMED.

Each party to bear its own costs.

Let Judgment be entered accordingly.


Dated:  October 24, 2014                              s/Gerald E. Rosen
                                                      Chief Judge, United States District Court

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on October 24, 2014, by electronic and/or ordinary mail.

                              s/Julie Owens
                              Case Manager, (313) 234-5135